**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| STEVE PEGG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 3:16-CV-783-PPS |
| | ) | |
| NEXUS RVS LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This case involves the purchase of an RV which, according to the plaintiff Steve Pegg, was riddled with problems from the moment he drove it off the lot. Pegg claims the manufacturer and seller, Nexus RVs, LLC, failed to live up to its express and implied warranties and also asks the court to strike Pegg's expert [DE 48, 50]. Because I find that the expert opinion is reliable and relevant, and that genuine issues of material fact remain as to Pegg's claims, both motions will be denied. In other words, a jury is going to have to decide whether Mr. Pegg is a fussy nitpicker, on the one hand, or was an aggrieved customer, on the other.

### Background

Pegg, a Texas resident, purchased a 2017 Nexus Ghost Recreational Vehicle on May 4, 2016, for a total purchase price of $198,322.13 (which included a vehicle service contract). [Pegg Aff., DE 56 at 2.][1] Nexus RV manufactured the RV which was

---

[1] Nexus complained that Pegg's affidavit is unsigned, and that Pegg cited to non-existent paragraphs in the affidavit. [DE 55 at 2.] Clearly, Pegg's incomplete affidavit was filed in error, and at my request, he filed a supplement on May 9, 2019 [DE 56], attaching a complete copy of

purchased by Pegg, and as part of the deal, Nexus provided Pegg a 1 year warranty. [*Id.*; DE 52-3.] The warranty covered "defects in Nexus materials and/or workmanship in construction of the recreational vehicle." [DE 52-3 at 1.] The warranty also provided that "[a]ll obligations of Nexus pursuant to this Limited Warranty are limited to replacing or repairing the defective part of component." *Id.*

On May 5, 2016, Pegg took delivery of the RV from the Nexus factory in Elkhart, Indiana. During the pre-delivery walk through inspection, Pegg discovered a number of problems with the RV, including: wrong size bed installed, safe box not installed, trim behind rear, bunk wiring missing, trim behind rear TV falling off, trim missing between bedroom and bunk, passenger slide out not closing properly, no hot water, squeak in transition plate, missing tile work, no air compressor, no slide trade in cargo, and the rear cargo doors were coming open. [DE 56 at 2-3; spreadsheet (DE 52-4).]

Pegg stayed overnight so that Nexus could repair the problems. [DE 56 at 3.] The next day, Nexus told Pegg that the defects were repaired, so he took delivery and headed home. *Id.* According to Pegg, he began experiencing problems with the RV on his way home from the Nexus factory. *Id.* For example, he discovered that the hot water was intermittently inoperable, the rear doors were still coming open, trim still needed to be fixed, and the transition plate still squeaked. [DE 52-4.]

---

the affidavit, which was properly signed and certified. I then granted Nexus the opportunity to file a supplemental reply so that it could respond to the complete affidavit. [DE 63.]

When he got home, Pegg notified Steve Tobias (the Nexus service manager), via text message of the following issues:

a.      Shower leak dripping from the left side of the shower pan;

b.      transition plate still squeaking;

c.      Water tank was sliding to the passenger side, drooping, and spilling while moving.  The overflow and the outlet were only a few inches apart;

d.      rear passenger cargo door doesn't close properly because of the tank;

e.      suspension squeaky while turning right;

f.      bumper dent;

g.      mirror had a crack;

h.      access panel to laundry;

i.      hot water in and out;

j.      MCD shade in dinette would not go all the way up;

k.      cargo bay in front of passenger tire was banged up; and

l.      leak above the battery bay.

[DE 51-5.]

Prior to leaving on a two-week family trip, Pegg contacted Tobias in order to obtain warranty repairs of these defects. [DE 56 at 3.] However, Tobias could not arrange for an authorized repair facility to perform the warranty repairs on the route for the family trip.  *Id.*  Instead, Tobias mailed parts to Pegg so he could repair the RV's water tank himself.  *Id.*

After returning from the family trip, Nexus selected and arranged for Mike's RV to repair the defects beginning on June 15, 2016. [*Id.*] Nexus authorized Mike's RV to perform warranty repairs on its behalf. [Donati Dep., DE 52-18, at 39-40.] In anticipation of the service visit, Pegg provided a list of defects directly to Tobias including: transition plate squeak, screen in top bunk falling out, dent in bumper from the factory, shower leaks, sink leaks, fresh water tank loose and sliding around, rear door not closing properly, driver's side suspension squeaky, crack in mirror, access panel falling off, hot water intermittently inoperable, shade in dinette won't go all the way up, cargo door damaged from loose fresh water tank, squeak in dining window, cargo door misaligned, wood trim bubbling, wall seam tape peeling, water leak over battery door, passenger side cargo compartment leaks, bath sink inoperable, and electrical plugs inoperable. [DE 56 at 4; DE 52-4.]

On June 15, 2016, Mike's RV picked up the RV to perform those repairs. [DE 56 at 4.] Because Pegg hoped to use the RV for the long Fourth of July weekend, and since Mike's RV was waiting for parts from Nexus, Mike's RV returned the RV to Pegg on June 28, 2016. *Id.* However, upon return of the RV, Pegg discovered roof damage to the RV. *Id.* Mike's RV acknowledged the roof damage and stated it would take the RV back, patch up the roof, and install a new vent hood. *Id.* Mike's RV took the RV back that same day and returned it to Pegg on June 29, 2016. *Id.*

When he got the RV back, Pegg discovered that the RV was filthy, as if someone had stayed in it, and there were scratches down both sides of the RV. *Id.* Although

4

Mike's RV attempted to buff out the scratches and repair the issues, Mike's RV failed to repair all of the problems. *Id.*

About a week later, on July 7, 2016, something strange happened; Pegg received a letter from the Fort Worth Traffic Division indicating the RV had been in an accident on June 17, 2016 — a time period during which Mike's RV was supposed to be repairing the RV. [DE 56 at 5.] Pegg then immediately contacted Tobias and told him the RV had been in an accident while in the possession of Mike's RV, and asked Tobias to find another authorized repair facility to service the RV. *Id.*

Nexus then indicated that it would arrange for the RV to be transported to the Nexus factory in Elkhart, Indiana. *Id.* In a letter dated July 20, 2016, Nexus agreed to complete the repairs, but noted that Nexus was not responsible for the accident at Mike's RV, and that it was "not responsible for this situation." [DE 52-8 at 2.] Evidently, this was Pegg's problem to work through. Nexus did say it was willing to work with Pegg's insurance carrier on the items that were damaged in the accident, provide estimates, and perform the repairs if given authorization from State Farm. *Id.* This response ticked Pegg off, and he responded with an e-mail dated July 25, 2019, stating he was "not in agreement with your letter. As stated before I will not release you from any obligation while my vehicle [is] in for service with you and your contracted company." [DE 51-11.]

After missing multiple pick up deadlines, Nexus finally picked up the RV on August 19, 2016. [DE 56 at 6.] Pegg provided Nexus with a list of 72 defects to be

repaired at the Nexus factory.  *Id.*  Despite telling Pegg that the repairs would be completed by September 16, 2016, Nexus again missed its deadline.  *Id.*  Pegg claims that in reality, Nexus did not even start work on the RV until October 1, 2016.  [Spratt Dep., DE 52-19 at 29, 33.]  However, Nexus points to an e-mail to Pegg dated September 27, 2019, stating that "[t]he coach warranty repairs are completed and the Body and Paint repairs are going to start as soon as I get the estimate into State Farm."  [DE 51-15.]  Ultimately, Pegg believed, "[a]fter months of waiting, I felt like I had no choice but to file a lawsuit."  [DE 56 at 6.]

Pegg filed his complaint on November 21, 2016 [DE 1], and subsequently an amended complaint.  The amended complaint contains two counts: (1) breach of the warranty and contract; and (2) breach of the Magnuson Moss Warranty Act ("MMWA") premised upon the breaches of warranty in the first count.  [DE 16.]

Although Nexus disputes the amount of time the RV was out of service, according to Pegg, the RV was out of service for 112 days, or more than half the first seven months of his ownership. [DE 56 at 8.]  Pegg states if he had known about the RV's many problems, he never would have purchased it.  [*Id.* at 7.]

Plaintiff's expert, Thomas Bailey, inspected the RV on April 23, May 10, and May 11, 2018. [DE 52-10 at 2.] Bailey opined that 64 of the 72 defects Pegg presented to Nexus were covered under the warranty and were not repaired within a reasonable amount of time.  [DE 52-14 at 6-15; DE 52-10 at 3.]  He also opined that 19 defects from Pegg's list of 72 defects that he reported to Nexus were never repaired.  [DE 52-10 at 2-3; DE 52-14

at 6-30.]  Additionally, during his inspections, Bailey discovered 86 additional defects with the materials and workmanship in the RV.  [DE 52-10 at 3; DE 52-14 at 34-76.] Bailey also believes that Pegg gave Nexus a reasonable opportunity to repair all of the defects, and those defects caused the RV to be out of service for an unreasonable amount of time.  [DE 52-10 at 4; DE 52-14 at 6-15.]  According to Bailey, the RV was not merchantable, and the defects in the RV substantially impair the RV's use, value, and/or safety.  [DE 52-10 at 4; DE 52-14 at 16-76.]  Finally, it is Bailey's opinion that the RV is worth $123,833.13 less than Pegg paid for it due to the many defects, repair history, failed repair attempts, and inherent diminished value.  [DE 52-10 at 5-6; DE 52-15 at 24-26.]

## Discussion

### Motion to Exclude Expert Tom Bailey's Appraisal/Diminished Value Report

Plaintiff's expert, Tom Bailey, proffered three reports: (1) a Certified Independent RV Investigation Report of Alleged Manufacturer Defects; (2) a Certified Independent Infrared Thermography Report; and (3) a Certified Independent RV Appraisal/Diminished Value Report.  It is only the last report that Nexus takes issue with, claiming the diminished value calculation is inadmissible and should be excluded.

Let's start with some basics. Federal Rule of Evidence 702 governs the admissibility of expert testimony.  It states, in relevant part, that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical or other

specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The Rule "also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case." *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 824 (7th Cir. 2010). The district court must perform a "gatekeeping" function before admitting scientific testimony in order to ensure that "all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). As a threshold matter, the district court must determine (1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact with a fact at issue. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

The first step is to analyze the reliability of the expert. In doing so, the role of the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions. *Id.* Rule 702 contemplates that an expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Thus, in determining whether a proposed expert is qualified, a court may consider the proposed expert's full range of practical experience, as well as academic or technical training. *Smith*, 215 F.3d at 718. But "even a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Id.* (internal quotation

8

marks and brackets omitted). This means that a court "must rule out subjective belief or unsupported speculation." *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) (internal quotation marks omitted).

In *Daubert*, the Supreme Court identified four factors that are pertinent to the reliability inquiry: (1) whether the theory has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether it has been generally accepted within the relevant scientific community. 509 U.S. at 593-94. The inquiry is flexible and must focus solely on the principles and methodologies, not the conclusions they generate. *Id.* at 594. No single factor is either required in the analysis or dispositive as to the outcome. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141 (1999). And while *Daubert* involved scientific expert opinion, the logic of *Daubert* was extended by the Supreme Court to expert opinion based on technical and other specialized knowledge. *Id.*

If I think the expert's testimony is reliable, the next step is to determine whether the testimony is relevant. In making this determination, I must consider whether the testimony assists the trier of fact in understanding the evidence or in determining a fact at issue. *Cummins*, 93 F.3d at 368.

First, I am satisfied that Bailey is qualified to give expert valuation testimony. I have reviewed his CV, he has conducted more than 2,000 specialized RV and bus appraisals, has been retained as an expert in a number of similar appraisal and defect investigations, and has been in the RV industry for more than 50 years. [DE 53-2.] This

education, training, and experience makes him more than qualified to testify as an expert under Rule 702.

Next, in looking at Bailey's methodology and valuation opinions, I also find that these are reliable. Although Nexus argues that Bailey's opinion fails to show how he arrived at the fair market value and diminished value calculations, but rather provided a conlcusory number, I disagree. In his appraisal/diminished value report, Bailey set forth 15 forces that can affect the value of an RV (including, among others, deterioration of constructed material, the existence of defects and malfunctions, and time out of service which could substantially impair the use or value of the RV), he defined an appraisal, he set forth the accepted methods to determine fair market value (FMV), he consulted sources such as the NADA (National Automobile Dealer Association) guide book which is published and an accepted guideline, he defined diminished value, and he then laboriously set forth the condition of everything in the RV from the siding on the exterior to the beds on the interior. [DE 49-2 at 6-22.]

Nexus does not like Bailey's deposition testimony that he "consider[ed] everything in a lump sum when I'm formulating my opinion. I'm establishing the value." [DE 49-3 at 69; DE 49 at 11.] But that is kind of how an appraisal works. As several other courts have recognized, appraisal is an art, not a science. *See Hawthorne Partners v. AT&T Technologies, Inc.*, No. 91 C 7167, 1993 WL 311916, at *4 (N.D. Ill. Aug. 11, 1993) (holding appraisal is not a branch of social science, "[a]ccordingly, in ruling on the admissibility of an appraisal expert's opinions, the court need not apply the same

standards of methodological rigor required of social scientific inquiry"); *In re Bucktown Station, LLC*, No. 11 B 02004, 2011 WL 3651336, at *3 (N.D. Ill. Aug. 18, 2011) ("Expert appraisals are based on a recognized art, not science; and on experience, not a crystal ball.").

Another court in this district recently dealt with a similar challenge to a valuation opinion by Bailey in an RV case, and found it was admissible:

> Mr. Bailey's approach may not have been "scientific," but it was specialized as well as technical, which is allowable under Rule 702. *See Lees v. Carthage Coll.*, 714 F.3d 516, 524-25 (7th Cir. 2013) ("Rule 702, . . . does not condition admissibility on the state of the published literature, or a complete and flaw-free set of data.") As noted recently by a district court within this circuit when addressing an insurance field adjuster's challenged methodology:
>
> The Seventh Circuit has cautioned that the test for reliability for nonscientific experts is flexible. Unlike scientific or technical experts, whose hypotheses can be tested or subjected to peer review and whose methods can be measured against specific industry standards, an insurance adjuster and appraiser cannot be so mechanically scrutinized. [The field adjuster's] opinions rely on his experience, and expert testimony is not unreliable simply because it is founded on [a witness's] experience rather than data; indeed, Rule 702 allows a witness to be qualified as an expert by knowledge, skill, experience, or education. *Church v. Church Mut. Ins. Co.*, 13 C 1625, 2016 WL 772787, at *4 (N.D. Ill. Feb. 29, 2016).

*Hoopes v. Gulf Stream Coach, Inc.*, No. 1:10-cv-365, 2016 WL 1165683, at *10 (N.D. Ind. Mar. 25, 2016). I concur with this analysis and conclusion about Bailey's testimony. Because Bailey made three inspections in this case, collected data, and then made a valuation based upon his experience in the industry and as an appraiser, his valuation methodology is reliable.

In sum, like the court found in *Kuberski v. Allied Recreation Group, Inc.*, No. 1:15-cv-320-RL-SLC, 2017 WL 6765342, at *7 (N.D. Ind. Nov. 7, 2017), the challenge relating to Bailey's "opinions relating to the valuation of the Subject RV attacks the substance of his conclusions rather than the reliability of the methodology he used, and the former (unlike the latter) is something for the jury to consider."

The next consideration is whether Bailey's opinions are relevant and will assist the jury in determining Pegg's damages. Such an opinion is relevant if it is likely to "assist the trier of fact to understand the evidence or determine a fact in issue." *Hoskins v. Trucking*, 4:07-CV-72 JD, 2010 WL 4000123, at *13 (N.D. Ind. Oct. 12, 2010). In this case, Bailey opines that the RV's diminished value (or the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they were as warranted), is $123,833.13. [DE 52-10 at 5.] Nexus argues that this opinion is irrelevant because the proper measure of damages is the cost of repair, not the diminished value. [DE 49 at 9.] As discussed later in this opinion, the parties dispute the proper measure of damages in this case. The warranty purports to limit the obligations of Nexus to replacing or repairing the defective parts. [DE 51-4 at 1.] However, Pegg argues that his damages are not limited to the cost of repair or replacement because the proper measure of damages under Indiana law and the MMWA is the difference in value of goods plus incidental and consequential damages, and additionally, there is a question of fact as to whether the warranty failed of its essential purpose. [DE 53 at 10-11.] Because there is a genuine issue of material fact as to

whether the limited remedies failed their essential purpose, Bailey's opinion on damages is relevant.

Nexus' main fault regarding Bailey's calculation is that it "does not separate or break down his opinion as to each issue or itemize damages by defect" [DE 51 at 18], so the jury would not be able to adjust the amount of damages up or down depending on how they see fit. But this just isn't true. I don't see why the jury could not adjust the diminished value of the RV if it found that Nexus' warranty did not cover all of the enumerated defects. In that regard, Nexus is free to present contradictory expert opinion focusing on individual defects in an effort to reduce the "diminished value" that Bailey arrived at. It seems to me that Nexus' concerns "are best considered at trial, in the context of cross-examination, rather than at the present stage, for the purpose of excluding [expert] testimony altogether." *Coachmen Indus., Inc. v. Kemlite*, No. 3:06-CV-160-CAN, 2008 WL 4858385, at *10 (N.D. Ind. Nov. 10, 2008).

Nothing in the three cases cited by Nexus in support of its argument mandate a different result. In *Zimmer, Inc. v. Stryker Corp.*, 3:14-CV-152 JD, 2018 WL 276324, at *3-4 (N.D. Ind. Jan. 3, 2018), the Court excluded a damages expert's lost profits calculations in an action for breach of a non-compete agreement because the expert solely attributed lost revenues and profits to the defendants' alleged wrongdoing without ever considering the possibility that the lost revenues and profits flowed from other events. That case is far afield from this one. So is the next case relied on by Nexus — an antitrust case involving an expert study about lost profits that did not "establish any

variation in the outcome depending on which acts of AT&T were held to be legal and which illegal." *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1163 (7th Cir. 1983). Finally, Nexus cites a Fourth Circuit pharmaceuticals case, where the expert testified to lost sales damages. *Pharmanetics, Inc. v. Aventis Pharm., Inc.*, 182 F. App'x 267, 270-71 (4th Cir. 2006). These cases all involve completely different factual scenarios that have no bearing on the case before me now, involving an expert opinion on damages for breach of warranty in a defective goods case.

I do think that Bailey's valuation opinions are relevant and will assist the trier of fact in this case. Before moving on to the motion for summary judgment, there is one last thing to address. Nexus argues in a footnote that Bailey is unreliable "because he is a convicted felon for multiple crimes involving dishonesty." [DE 49 at 10 n.1.] Several courts have ruled on motions in limine on this matter, and have found under Rule 609(b) that the more than two decades old convictions had little compelling impeachment value, and would be more prejudicial than probative. *See Hoopes v. GlulfStream Coach, Inc.*, No. 1:10-cv-365, at 11-12 (N.D. Ind. Dec. 2, 2016) [DE 53-6]; *Herrera v. LaMesa RV Center, Inc.*, No. D-1314-cv-2016 (N.M. Nov. 20, 2017) [DE 53-7]; *Hope v. Forest River, Inc.*, No. 5:17-cv-133 (N.D. Oh. Mar. 19, 2018) [DE 53-8]; *Nicholson v. Jayco, Inc.*, No. 5:15-cv-02010-SL (N.D. Oh. Apr. 18, 2018) [DE 53-9]. I don't think Bailey's 1991 criminal convictions should preclude him from offering expert testimony in this case. If anything, evidence about his criminal history would go towards his credibility, not the admissibility of his opinions, but the convictions are so distant that

they are probably not admissible at trial in any event.  *See Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1068 (7th Cir. 2013) (expert credibility determinations are factual matters to be determined by the trier of fact); Fed. R. Evid. 609(b).

Having found Bailey's expert testimony both relevant and reliable, the motion to strike is denied.

## Motion for Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Nexus criticizes Pegg for relying "heavily" upon his own personal affidavit. [DE 63 at 4.] So, what? It has long been held in this circuit that "[a party's own] deposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving . . . As we have repeatedly emphasized over the past decade, [such evidence is] perfectly admissible . . . at summary judgment." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013).  As long as a declarant makes statements based upon personal knowledge, the affidavit can support a summary judgment motion.  *Id.* at 968.

Pegg must first establish a breach of warranty.  The parties concur that to prevail on the breach of warranty claim under Indiana law (Count One), Pegg has the burden of establishing, by a preponderance of the evidence, the following five elements: (1)

15

Pegg complied with the terms of the warranty; (2) the RV contained a defect covered by the warranty; (3) Nexus was given a reasonable opportunity to perform the necessary repairs; (4) Nexus was unable to repair the defects within a reasonable time or after a reasonable number of attempts; and (5) Pegg has suffered damage. *Cimino v. Fleetwood Enters., Inc.*, 542 F.Supp.2d 869, 882 (N.D. Ind. 2008).

Before addressing these factors, I also note that the MMWA creates a federal cause of action for breach of warranty under state law. *See* 15 U.S.C. § 2310(d)(1). Thus, Pegg's MMWA claim for breach of warranty in Count Two rises and falls with his breach of warranty claims under Indiana law. *See Schiesser v. Ford Motor Co.*, No. 16-cv-730, 2016 WL 6395457, at *4 (N.D. Ill. Oct. 28, 2016) ("The ability to sustain a cause of action under the Magnuson-Moss Act is dependent on the existence of an underlying viable state-law warranty claim.").

First, Nexus claims that Pegg did not satisfy the warranty terms because he did not send Nexus a certified letter notifying Nexus about the RV's defects. [DE 51 at 12.] It is true that the warranty requires Pegg to notify Nexus by certified mail with a list of items to be repaired [Warranty, DE 52-3], and it is undisputed that Pegg sent text messages and emails instead. However, Nexus responded to Pegg's texts and e-mails, and no one ever told him that he needed to send a certified letter. [DE 56 at 3; 52-4, 52-9.] Substantial compliance is often sufficient in contract cases. *Employers Ins. Of Wausau v. Browner*, 52 F.3d 656, 664 (7th Cir. 1995). And "[w]hether a plaintiff substantially performed its contractual duties is ordinarily a question of fact." *F. McConnell and Sons,*

*Inc. v. Target Data Sys., Inc.*, 84 F.Supp.2d 961, 978-79 (N.D. Ind. 1999). As such, whether

Pegg substantially complied with the terms of the warranty is a question of fact

delegated to the jury – it would not be appropriate for me to make this determination

on summary judgment.

Next, Nexus claims that Pegg fails because he did not provide Nexus with a

reasonable opportunity for repair. In an attempt to shore up this argument, Nexus first

insists that Pegg only gave it one repair attempt (the first one at the factory). [DE 51 at

13-14.][2] This is just plain disingenuous. As I see it, a reasonable jury could conclude that

Pegg gave Nexus at least three times to repair the RV. There was the first repair

attempt at the factory on May 5, 2016, the second at Mike's RV, and the third at the

factory on August 19, 2016. To the extent Nexus argues Pegg cut the Mike's RV attempt

short (when Pegg used the RV for a long weekend), or that the last attempt does not

count because Pegg filed this lawsuit before he could review the final repair work, or

that the RV was actually in for repair less days than Pegg claims, or that Pegg

abandoned the RV, these are all quintessential jury questions because they involve

answering the question what is "reasonable."

Indeed, this question of reasonableness reflects the fact-specific nature of breach

of warranty claims. As I have noted before in a case involving the sale of golf carts,

Indiana law provides "[t]he standard to be applied in determining whether or not there

---

[2] In its reply memorandum and supplemental reply, Nexus changes its tune a bit and argues that Pegg provided Nexus with no more than two repair attempts. [DE 55 at 2; DE 63 at 3, 5-6.]

has been a breach of warranty is one of reasonableness in light of surrounding circumstances." *Swan Lake Holdings, LLC v. Yamaha Golf Cart Co.*, 3:09-CV-228-PPS, 2010 WL 3894576, at *3 (N.D. Ind. Sept. 27, 2010) (quotation omitted).  Nexus cites *Marchionna v. Ford Motor Co.*, No. 94 C 275, 1995 WL 476591, at *11 (N.D. Ill. Aug. 10, 1995), for the proposition that Pegg did not give them a reasonable opportunity to repair, but that case reasoned the "plurality of the word 'attempts' indicates that [defendant] was entitled to at least two, and possibly three attempts to correct the defect."  Pegg has presented evidence that there was at least two, if not three opportunities, for Nexus to repair the RV in this case.  Nexus argues in its supplemental brief that some items were submitted to it for repair only once.  [DE 63 at 7-8.]  It is free to present this argument and supporting evidence to the jury, who must decide whether Nexus was given a reasonable opportunity to make the repairs.

Nexus also argues that the unrepaired defects were excluded from the warranty because they are really design defects.  [DE 51 at 11.]  The warranty provides for a one year "warranty under normal use against defects in Nexus materials and/or workmanship;" but admittedly, does not cover design defects.  [DE 51-4 at 1.]  There is a difference between a design defect not covered by the warranty (which occurs when the product is built in accordance with specifications, but the design itself is inherently defective), and defects in material and workmanship which are covered by the warranty (and refer to departures from a product's intended design).  *Schechner v. Whirlpool Corp.*, 237 F.Supp.3d 601, 613-14 (E.D. Mich. 2017).

18

Pegg complained that the room was separating from the roof, and Bailey confirmed during the inspection that the roof sides are not glued down and flexed. [DE 56 at 5; DE 52-4; DE 52-9, DE 49-2 at 26.] Nexus contends the roof separating from the structure of the RV is a design defect, not a failure in materials or workmanship. [DE 51 at 15.] To spin this argument out, if Nexus is really claiming the separating roof was a design defect - then it is claiming that the roof was built correctly to its specifications, and that the design itself must be inherently defective. This scenario makes much less sense than the other option – that the separating roof was caused by a defect in the material and workmanship. But ultimately, it is not for me to sit here and debate whether defects like the separating roof are design defects or a failure in materials/workmanship - this is an issue of fact reserved for the jury. In this case, a jury could determine either, and should be given the opportunity to make that decision. *See Hoopes v. Gulf Stream Coach, Inc.*, No. 1:10-cv-365 JD, 2017 WL 6884317, at *3 (N.D. Ind. Apr. 13, 2017) (denying motion for judgment as a matter of law made during trial, finding there was sufficient evidence for the jury to conclude that defects were covered by the warranty, and were not design defects).

Nexus claims that one answer given by Pegg's expert, Bailey, definitively establishes that the separating roof was a design defect. Bailey was asked during his deposition,"[i]f that is, in fact, how they design their roofs, would you say that this is a design defect?" and Bailey answered, "I would say that that is not the proper way to

secure a roof." [DE 51-14 at 87.] I see this statement as a claim of a defect in workmanship, not a claim of a design defect, or so a jury could reasonably find.

Continuing on with whether certain defects were covered by the warranty, Nexus also asserts that the unrepaired defects were also not covered. [DE 51 at 18.] Pegg's expert, Bailey, has submitted that 19 defects from Pegg's list of 72 defects were not repaired, and with the exception of the suspension squeak that Bailey acknowledges as being covered by the chassis warranty, Bailey believes the remaining unrepaired defects are covered by the Nexus warranty. [DE 52-10 at 2-3.] Taking the evidence in the light most favorable to Pegg, as I must at this stage in the proceedings, reasonable minds could conclude that the unrepaired defects are covered under the warranty as defects in the material and/or workmanship. Obviously additional evidence will be presented to the jury on this issue at trial.

Nexus also argues that the additional 86 defects that Bailey discovered during his inspection [DE 52-10 at 3] are irrelevant to Pegg's breach of warranty claims, as those problems were never submitted for repair. Pegg contends any defects discovered by Bailey are relevant to Pegg's breach of implied warranty claim. [DE 52 at 20.] All of which brings us to an analysis of the available damages.

While Indiana Code § 26-1-2-719(1) allows buyers and sellers to limit the remedy for breach of warranty, "[l]imitations of remedy are not favored in Indiana and are strictly construed against the seller on the basis of public policy." *Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634, 643 (Ind. Ct. App. 2004). "Where circumstances cause an

exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in IC 26-1."  Ind. Code § 26-1-2-719(2).  In other words, "a limited remedy, such as limiting damages to replacement parts, may not be valid if the warranty fails of its essential purpose."  *Pizel v. Monaco Coach Corp.*, 364 F.Supp.2d 790, 796 (N.D. Ind. 2005) (citing Ind. Code § 26-1-2-719).  If the warranty fails of its essential purpose, a plaintiff is entitled to all remedies available under the commercial code (regardless of the warranty clause attempting to limit recovery), including incidental and consequential damages.  *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 746 N.E.2d 941, 947 (Ind. 2001).

In explaining the analysis for determining whether a limited remedy failed of its essential purpose, the *Perry* court quoted the following example from *Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1085 (Ind. 1993) (*abrogated on other grounds*):

> Thus, for example, where the sale of a car was accompanied by the exclusive remedy of repair and replacement of defective parts but attempted repairs were ineffective in correcting the problems, the purchaser was entitled to recover an amount in excess of the cost of repairs.  The exclusive remedy of repair and replacement of defective parts failed of its essential purpose because the car could not be repaired so as to operate free of defects as promised in the express warranty.

*Perry*, 814 N.E.2d at 643 (quoting *Martin Rispens*, 621 N.E.2d at 1086).  This line of cases was followed in *Cimino*, a mobile home case like this one bringing claims under the MMWA, which reasoned:

> As in *Perry*, the Plaintiffs in this case have designated admissible evidence that, if believed by a reasonable jury, could establish that they complained repeatedly of defects to the warranting parties

and that the defects remained after multiple attempts at repair. If a jury viewed this evidence in a light most favorable to the Plaintiffs, the jury could find that the limited remedies failed of their essential purpose and the remedies for a full warranty would be available. As such, there is a genuine issue of material fact as to whether the limited remedies failed of their essential purpose.

*Cimino*, 542 F.Supp.2d at 888. I agree with these cases and this line of reasoning.

"Whether a limited remedy fails of its essential purpose is an issue of fact that a jury may determine." *Petroleum Helicopters, Inc. v. Rolls-Royce Corp.*, No. 1:15-cv-840-TWP-DML, 2016 WL 7179362, at *4 (S.D. Ind. Dec. 9, 2016) (quoting *Rheem*, 746 N.E.2d at 948). Here, I find that there is a genuine issue of material fact as to whether the warranty failed to serve its essential purpose. Pegg presented evidence that he repeatedly complained about problems with the RV, and the problems remained after several repair attempts. Viewing the evidence in the light most favorable to Pegg, as I must do at this stage of the proceedings, a jury could reasonably find that Nexus' limited remedy failed of its essential purpose. Moreover, as the *Cimino* court found, "[e]ven if the limited remedies have not failed of their essential purpose, the Plaintiffs are still entitled to the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted." *Cimino*, 542 F.Supp.2d at 888 (citing Ind. Code § 26-1-2-714(2)). Summary judgment is therefore denied on this issue, and the jury can determine whether the limited warranty fails of its essential purpose.

Regarding Pegg's claims for violation of implied warranties, the MMWA provides that "implied warranties may be limited in duration to the duration of a

written warranty of reasonable duration, if such limitation is conscionable and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty." 15 U.S.C. § 2308(b). In this case, the disclaimer of warranties is a bit confusing, and states:

> The Limited Warranty is expressly IN LIEU of any other express warranty and is further IN LIEU of any implied warranty including, but not limited to, any implied WARRANTY OF MERCHANTABILITY or FITNESS for a particular purpose. To the extent that applicable state and/or federal law prohibits the exclusion of any remedy permitted under state or federal law, any such remedy, including, but not limited to, implied warranties of fitness, use, merchantability or purpose, is limited to one (1), but not limited to, any implied WARRANTY OF MERCHANTABILITY or FITNESS for a particular purpose.

[DE 52-3 at 1.] The parties largely dispute whether Nexus properly limited the scope of the duration of the implied warranties to one year, and whether the one year limitation was unconscionable. But in this case, Pegg has presented evidence that, if believed by the fact finder, he had problems from the beginning with the RV [DE 56 at 7] and Bailey has opined that it was not merchantable at the time it was sold to Pegg. [DE 52-10 at 4.] Therefore, summary judgment is not proper on the claims for implied warranties.

Finally, Nexus contends that even if Pegg can prevail on his claims, revocation of the purchase agreement is not an available option for him. [DE 51 at 22-23.] Under Indiana Code § 26-1-2-608, a buyer can revoke his acceptance of the commercial unit if several conditions occur, including the non-conformity substantially impairs the value of the goods to the buyer and the revocation occurs within a reasonable time after the buyer discovered or should have discovered the grounds for revocation. "It is not

effective until the buyer notifies the seller of it." Ind. Code § 26-1-2-608(2). Pegg contends that he gave Nexus notice that he revoked his acceptance when he filed the amended complaint asking for an order finding he rescinded the transaction and/or revoked acceptance.[3] [DE 52 at 24.] However, the case Pegg cites to for the complaint being sufficient notice, is inapplicable. *LDT Keller Farms, LLC v. Brigittes Holmes Livestock, Co.*, 2011 U.S. Dist. LEXIS 34209, at *26 (N.D. Ind. Mar. 30, 2011), is an acceptance of goods case (livestock), which cites another case, *Collins v. Pfizer, Inc.*, No. 1:08-cv-888-DFH-JMS, 2009 WL 126913, at *2-3 (S.D. Ind. Jan. 20, 2009), for the proposition that notice is a condition precedent to recovery under Indiana Code § 26-1-2-607, and suggesting a complaint could serve as notice in personal injury cases. The notice requirement under section 607 (dealing with the effect of acceptance of goods and general notice of breach), is different than the notice requirement in section 608 (for revocation of acceptance).

The Notes for section 608 establish that the notice is to be determined by consideration of good faith, prevention of surprise, and reasonable adjustment. "More will generally be necessary than the mere notification of breach required under the preceding section. . . . [but] [f]ollowing the general policy of this Article, the requirements of the content of notification are less stringent in the case of a non-

---

[3] The amended complaint requests "damages as allowed by law," or, in the alternative, rescission of the contract plus damages and/or statutory remedies and relief as deemed proper, plus an "Order finding Plaintiff to have rescinded the transaction and/or to have revoked acceptance . . . ." [DE 16 at 10-11.]

merchant buyer." Ind. Code § 26-1-2-608 Notes ¶ 5. Frankly, both parties' arguments on this issue about the sufficiency of notice and whether revocation of acceptance should be available in this case are so bare-bones, that it is difficult for me to make a decision at this juncture. Because the adequacy of notice is usually a fact question inappropriate for summary judgment, *Boysen v. Antioch Sheet Metal, Inc.*, 306 N.E.2d 69, 71 (Ill. App. Ct. 1974), summary judgment will be denied on this issue as well.

### Conclusion

For the reasons stated above, Nexus's motion for summary judgment [DE 50] and its motion in limine to strike the expert opinion [DE 48] are both DENIED.

Finally, because I do not think the case *Mathews v. REV Recreation Group, Inc.*, No. 1:15-cv-247, 2018 WL 1586254 (N.D. Ind. Apr. 2, 2018), which is on appeal, is dispositive of this case, the Motion to Continue Trial [DE 70] is DENIED.


SO ORDERED.

ENTERED: July 2, 2019.

 /s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT